*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* S. R. RICHARDSON, Minor.

FOR PUBLICATION
July 25, 2019
9:05 a.m.

No. 346903 & 346904
Saginaw Circuit Court
Family Division
LC No. 17-035259-NA

Before: SAWYER, P.J., and BORRELLO and SHAPIRO, JJ.

BORRELLO, J.

In these consolidated appeals,[1] respondents appeal the termination of their parental rights under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (g) (failure to provide proper care and custody). For the reasons set forth in this opinion, we vacate the trial court's order and remand this matter for further proceedings.

## I. BACKGROUND

This case initially came to the trial court by way of a Department of Health and Human Services (DHHS) initiated child-protective proceeding regarding SRR on June 26, 2017, after SRR tested positive for the presence of marijuana at birth. The petition alleged that mother had an extensive history of substance abuse that had resulted in the termination of her parental rights to her two older children. The prior terminations occurred in 2015 and were based on mother's substance abuse and methamphetamine production. Father was not the father of those two older children. The petition further alleged that mother had failed to benefit from the services the DHHS had provided, that mother had knowingly used marijuana while she was pregnant, and that mother had placed SRR at an unreasonable risk of harm through her substance abuse that resulted in SRR's prenatal marijuana exposure. The only petition allegation against father, other

---

[1] *In re Richardson Minor*, unpublished order of the Court of Appeals, entered January 9, 2019 (Docket Nos. 346903 and 346904).

than that he was SRR's father, was added to the petition by oral amendment at the adjudication plea hearing. This allegation stated that father was currently incarcerated with the Michigan Department of Corrections (MDOC) and unable to provide a care plan for SRR.

The trial court assumed jurisdiction on the basis of mother's and father's respective pleas of admission to the petition allegations. The petition had originally sought termination at the initial disposition. However, the referee noted at the adjudication hearing that mother had "shown some significant desires to make major changes in her life that weren't made during the termination back in 2015" and that "[g]iven her age and situation the Court is of the opinion that she deserves to have that opportunity based on the information I have at this point in time so I would be looking at having the termination taken off the table to both these individuals and work with them." The referee warned mother that this was "a huge break" for her and that she was "on what we call a short leash." The referee also stated, "The key is—you understand—it's kind of your last straw given that you've had significant treatment—my understanding at least—or opportunities for treatment previously. And this is a chance for you to make that final step to completely get away from substances." The referee further indicated that termination could become an option again if mother did not "stay on the track of sobriety."

The initial disposition was held on August 28, 2017. Father was incarcerated but the court was unable to secure his presence by video link because father had been transferred to a different facility, apparently unbeknownst to his attorney or the court. MDOC staff also apparently ignored the orders that had been sent out indicating that father was to be made available for the hearing. Nonetheless, father's attorney waived any issue with the lack of father's presence, stating that he had "no objection proceeding without him today" subject to maintaining father's "right to object" to anything "out of the ordinary."[2] The referee stated,

---

[2] Regarding dispositional hearings, MCR 3.973(D)(2) states that the "respondent has the right to be present or may appear through an attorney." Notably, father had a right while he was incarcerated to participate in this hearing by telephone or videoconferencing technology, and this right is protected under these circumstances by placing certain obligations on the DHHS, the court, and the MDOC. See generally, MCR 2.004. For example, it is incumbent upon the "party seeking an order regarding a minor child," in this case the DHHS, to "contact the [MDOC] to confirm the incarceration and the incarcerated party's prison number and location." MCR 2.004(B)(1). As another example, the court must be satisfied that the requirements of MCR 2.004(B) were met before issuing each order requiring the MDOC to allow the incarcerated party to participate in the hearing by telephone or videoconference. MCR 2.004(C). Furthermore, the "court may impose sanctions if it finds that an attempt was made to keep information about the case from an incarcerated party in order to deny that party access to the courts." MCR 2.004(G). "A court may not grant the relief requested by the moving party concerning the minor child if the incarcerated party has not been offered the opportunity to participate in the proceedings as described in this rule," but "[t]his provision shall not apply . . . if the court determines that immediate action is necessary on a temporary basis to protect the minor child." MCR 2.004(F). In this case, although it seems that an attempt was made to give father the chance to participate in this hearing by videoconference, there is no indication that father declined or otherwise caused his inability to participate. It instead appears that father's ability to appear at the hearing was

"Being that this is original disposition with him in prison there isn't a whole lot we can do at this point for him . . . we'll get him up to speed and it will be probably the next hearing that's gonna be most important for him anyways." [3]

Mother had begun an inpatient substance abuse treatment program at Kairos Treatment Facility approximately one week before this hearing. Mother enrolled herself in this program. The court report also indicated that mother's parenting time visits had been positive with no concerns. Mother indicated that she had enrolled in a parenting class, which she had personally arranged to be provided to her and other women at Kairos, and was "willing to take as many parenting classes as—as need be." Mother also stated that at Kairos, she was participating in therapy and was working with doctors to get her seizures under control through medication. Her seizures were not completely under control yet.

The referee then questioned mother as follows about her seizures:

*Q.* I am extremely knowledgeable and familiar with seizures. Obviously, do you—have they given you a diagnosis of—sometimes they call it epilepsy, sometime they call is [sic] seizure disorder.

*A.* Epilepsy is my diagnosis.

*Q.* Okay. All right. And are they working with a neurologist over there right now?

*A.* Yes.

*Q.* Okay, and who's the neurologist working on it?

*A.* At—I believe it's Abbott.

*Q.* Okay.

*A.* Ah, that sounds about right.

---

impaired by the negligence of institutional actors or other individuals involved with the case. It also does not appear that the referee's decision to proceed was based on a finding that immediate action was necessary on a temporary basis for the child's protection.

[3] While the referee's initial statement is at odds with our understanding of the law--our Supreme Court has held that the "state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated." *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010)— it is clear that the referee correctly understood that the state's obligations were not completely negated by father's incarceration. The record reveals that the referee ordered the foster care worker at the conclusion of the hearing to contact father in prison and work with him to immediately develop a parent agency treatment plan.

*Q.* All right. Have you been working with a neurologist up to this point? 'Cause you said you have seizures.

*A.* I was not. I was using medical marijuana.

*Q.* Okay.

*A.* So.

*Q.* What you will probably find out in talking with a neurologist and everything, marijuana can exacerbate the seizures, depending on the types that you're having and everything because of fact—so it can make it worse for you. So, the question you want to maybe verify and everything with all the information I've been presented with is a problem for people with seizures.[4]

*A.* It was working for me but that's why I've got to try (inaudible)—

*Q.* Right.

*A.* —at the time, you know.

*Q.* Right.

*A.* I'm going—I will give it up. I want my baby back,—

*Q.* Right.

*A.* —so I'll play the battle with medication and do what I gotta do.

\* \* \*

*Q.* Yes. . . . Grand mal, petit mal?

*A.* Grand mal.

*Q.* Okay. All right. How frequently were you having them?

*A.* Until now I wasn't having them har—hardly ever but now—

*Q.* Okay, so now that you're off and everything—and it may afford the frontal lobe have a different affect or anything, other areas that can exacerbate I know that, so but there's also other medications so you're right, they will prescribe medications and then if it's not stable, then they raise the dosage until

---

[4] Notably, the referee's statements about the effect of marijuana on people who suffer from seizures did not refer to any record evidence.

such time as they figure we may need to try something. Usually it's finding the right dosage.

Mother indicated that she was on two different medications, one of which was already prescribed at the maximum dosage, and that her dosage for the other medication had been increased the previous night at the emergency room.

The referee stated, "Realistically, the issue I think we're looking at right now is sobriety." The referee noted mother's methamphetamine history and continued, "you got into marijuana and it's not unusual for people who use to get that, but I'm just letting you know I'm aware, you know, and those are things you need you—you need to change all your friends—that's part of life." The referee subsequently stated the following to mother:

Right now you're doing the right thing because as I indicated, you go into in-patient I'm w—I'm willing to work with you. I have—I took termination off the table. You know, they could have presented it, but I was gonna rule let's give you a shot.

* * *

My personal feeling is right now you need to focus on yourself and the issues that cause you to keep using, you know, substances. Right now it's my understanding marijuana. I have no information that you use anything else. So what sounds like is you gained some knowledge from the other case, haven't fully gotten there yet, now you're clear, we need to get you off the weed because you were still using, even after—here's what you have to realize. We worked out the plea, you continued to use.[5] That says to me you have a difficulty stopping using, okay? That what it says to me. I'm not gonna hold it against you but if you got out and you started to use again and everything, that's when it's going to be a problem.

At the hearing held on November 15, 2017,[6] foster-care worker Ryan Feldt reported that mother was released from Kairos on September 22, 2017, after completing 30 days of treatment. She last tested positive for marijuana on August 9, 2017, and drug screens on October 19 and 25, 2017, and November 6, 2017, were negative. Feldt stated that mother was attending counseling, and her therapist told Feldt that they were working on helping mother face her problems rather

---

[5] The six drug screens that mother completed leading up to this hearing were all positive for marijuana.

[6] As with the previous hearing, father was still incarcerated and his presence by telephone or videoconference was not secured "for some reason." Father's attorney was present and waived father's right to be present at the hearing. Father's attorney stated with respect to the next hearing to be held, "I assume the Court will take the steps to have my client participate by video."

than run away from them. SRR was injured while in her foster placement, having incurred two skull fractures after being dropped on her head. She received medical treatment and it seemed as though she would recover.[7] SRR had since been moved to a relative placement. There were no concerns with mother's parenting time, which had recently been increased. Mother indicated that her seizure medication was regulated and that she had not had a seizure in two months. Mother also testified that someone else was always home with her and that she could tell when she was about to have a seizure, so she knew how to protect herself and the baby.

The referee stated,

> I need to know that you're done with this illegal drug lifestyle and anybody else around you. All right? I mean, that's a huge thing going from meth and losing your kids and cooking and all that stuff and now you're still back using marijuana and you lose your child and everything else. That's the negative side. The flip side is you've gone after it with gangbusters. You jumped into Kairos, you did that program 30 days and they, you know, felt that that was sufficient for you—it may very well have been. It looks like you've gotten serious and really buckled down. I hope this is a life change and not let's get through this, gets my kids back, get them out of my life and then go back and do things, okay? So we've got you on medication now with the doctor, appropriate actual treatment rather than, you know, the other thing in reference to your seizures, along that line, so things are moving well but we have to be cautious and we have to know that this is a lifetime. If you—let's see, you went in, you pled on the 7th of August, on the 22nd is when you entered Kairos and so you've been on—out on September 22nd, so we're a month and a half since you got out which is once you get out, that's when you wanna see how well are you going to do. And usually it's at the three month mark that we start to see people starting to also to fade; they were doing well and then they start fading. So we need to get there to see that, all right? So what I'm telling you is be patient because you got a huge break and everything, so let's be patient along those lines as far as returning.

By the time of the next review hearing on January 26, 2018,[8] mother had tested positive for marijuana, but she also had secured a medical marijuana card. The referee stated:

> It's my understanding that mom has obtained a medical marijuana card and the purpose for that is for seizures and what we're looking at at this point in time th— this Court is unaware of marijuana being used for seizures. I'm gonna give you

---

[7] The foster parent was investigated as a result of this incident.

[8] Father's attorney stated that father was not present because he was still incarcerated and although he was scheduled to appear by videoconferencing, the previous hearing had gone longer than expected. Father's attorney represented that the court's deputy clerk contacted the facility where father was incarcerated and "they were unable to accommodate us for purposes of this morning's hearing." Father's attorney again waived father's attendance.

the benefit of the doubt. I mean, I've actually—the information I have from my life experience is contrary.

The referee's skepticism became more apparent as the hearing progressed. The referee stated:

> It's hard for me to believe that her—that if it's an addiction that it's that strong that she would jeopardize her child, yet the Court has never heard of that medication being used for seizures, so I'm giving the opportunity for counsel to— and I'll be honest with you, you've got a written document, that's not gonna be sufficient for the Court. I need testimony.

The referee also told mother that "It—it doesn't matter what it's for. You suddenly decided to take on something that the Court had already said no and you're supposed to be substance abuse free so now this."

The referee nonetheless determined that an evidentiary hearing would be held to consider the matter, stating as follows:

> All right. And I will indicate for the record here that my understanding is she's testing positive for marijuana because she's got a medical marijuana card and the issue that we're gonna hear is is that appropriate or not. And just so you understand, it's one of the things that because substance abuse was an issue in the past and obviously methamphetamine, you know, so—something different. Any prescription medication at this point in time is going to come under—under some scrutiny. It's not just that it's marijuana. It's suddenly you came up with—I'm gonna pick Norco and everything and all of a sudden you're taking Norco for seizures and everything like that, I'd have the same question, okay? 'Cause I've not heard of that before. . . . The Court is open to hearing testimony concerning that issue and then we can resolve that and you can make your decisions after that hearing depending on how it works out.

At the hearing, mother called Dr. Anthony Schultz to testify about mother's use of medical marijuana. He had treated patients with seizures as an emergency physician and had been fully trained to manage all forms of seizure. Schultz currently practiced holistic and alternative medicine.

Schultz testified that he met with mother in January 2018, because she wanted to be able to use medical marijuana to manage her seizures and treat her chronic ankle pain. According to Schultz, marijuana has been shown to help control grand mal seizures, and six states have approved the use of medical marijuana solely for the treatment of seizures even though those states do not allow medical marijuana to be used to treat other conditions. Schultz testified that as a medical doctor, he had concluded that marijuana was an allowable medication for mother's condition and that it was likely to help her condition. Schultz explained that mother had developed intolerances for the medication that she was currently using to control her seizures when she visited him, and she had reported that her current medication was not working well by itself for her.

-7-

Schultz indicated that he considered a patient's substance abuse history and that he knew that mother had gone through a drug rehabilitation program. However, he was unaware of her prior arrest for using methamphetamine. He explained that his opinion about the appropriateness of medical marijuana would be influenced by recent addiction issues and that he did not find it concerning if a patient had previous experience with marijuana.

Schultz stated that he advised patients with children to moderate their use of marijuana to ensure that they were not under the influence while caring for children, either by not using or by using only a small amount. He noted that this level of caution was also necessary with other prescription anti-seizure medications, which also could have "ill effects." Schultz testified that if mother used medical marijuana as she had been instructed, she could safely care for her child.

A letter from mother's neurologist, Dr. Margaret Frey, was admitted into evidence. This letter stated:

> [Mother] is a patient under my care for management of epilepsy. Her epilepsy is currently controlled with medications and she is compliant. She utilizes medical marijuana for other symptoms, though she states that her seizures are markedly improved when she uses it. There is evidence that medical marijuana is helpful for reducing breakthrough seizures in patients with intractable epilepsy and I do at times use it for this purpose. Though I do not see a clear need for medical marijuana for her epilepsy in this case, it will not worsen her seizures and I am not opposed to her using it from a neurologic standpoint.

Mother testified that she sought her medical marijuana card to treat her epilepsy and ankle pain. According to mother, her grand mal seizures were not being adequately controlled by her other medication. Mother stated that she had fewer seizures once she started using medical marijuana and that the medical marijuana significantly improved her quality of life. She also stated that she tried to keep her marijuana use to a minimum, unless her pain was worse, as Schultz had recommended. Mother understood the importance of not being impaired while she was caring for her child, and her current safety plan was to have three other adults living with her so that someone could care for the child if mother needed to use her medicine. Mother admitted that she struggled with addiction, and she continued to participate in substance abuse therapy to prevent her from relapsing. Mother agreed not to use medical marijuana within eight hours of any parenting time visit.

Feldt testified that despite Schultz's testimony about mother's medical marijuana use to control her seizures, the DHHS's stance was that mother "remain sober" and that his opinion had not changed. However, Feldt also admitted that there had not been any incident during mother's parenting time that would cause any concern about the child's safety in mother's care.

The referee ruled as follows:

> I don't find it's being used for the seizure purposes; I think it's being used for other reasons and we gave you the break in the first place to get off of the marijuana along those lines. Because we—because this Court is concerned that you're continuing and there is an addiction phase there with the marijuana and

-8-

that more the for seizure purposes has been a secondary or third reason being put forward that there's other reasons starting with pain. So, that suggests to me, in all candor, that you're trying to find reasons to justify having it prescribed to you. And so for that reason at this point in time I am going to indicate that marijuana usage must stop.

In reaching this conclusion, the referee noted that marijuana was "the issue" at the beginning of the case. The referee claimed that at the beginning of the case "there was no discussion about it's being used for controlling of seizures or anything along those lines." However, the referee's recollection on this point was incorrect. As earlier cited, mother and the referee engaged in a lengthy conversation about mother's epilepsy and treatment at the initial disposition. During the course of that discussion, mother indicated that she had been using medical marijuana to control her seizures, the referee explained his belief that medical marijuana was not a valid treatment for seizures and actually made them worse, and mother essentially agreed to try more traditional treatment options for a time in an attempt to comply with the court's wishes and regain custody of her child.

With respect to the referee's ruling on mother's use of medical marijuana at the conclusion of the evidentiary hearing on the matter, the referee found that the doctors did not make it clear that medical marijuana "is what is medically necessary." However, there is no medical authority cited in the record to support this conclusion. Additionally, this ruling runs contrary to the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq.*, which states, in relevant part: "[a] person shall not be denied custody or visitation of a minor for acting in accordance with this act, unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated." MCL 333.26424(d). Furthermore,

> There is a presumption that a qualifying patient or primary caregiver is engaged in the medical use of marihuana in accordance with this act if the qualifying patient or primary caregiver complies with both of the following:
>
> (1) Is in possession of a registry identification card.
>
> (2) Is in possession of an amount of marihuana that does not exceed the amount allowed under this act. The presumption may be rebutted by evidence that conduct related to marihuana was not for the purpose of alleviating the qualifying patient's debilitating medical condition or symptoms associated with the debilitating medical condition, in accordance with this act. [MCL 333.26424(e).]

In this case, there is no dispute that mother had a medical marijuana card. Despite this evidence, the referee made a finding that mother's marijuana use was not for a legitimate medical purpose because, in the referee's opinion, marijuana was not "medically necessary." But this is not the standard under MCL 333.26424(d) and (e). In addition, in order to reach this conclusion, the referee had to completely discount the unrebutted evidence submitted by *two doctors* that medical marijuana *is* a valid treatment for epilepsy, and the referee had to discredit mother's testimony that it was actually helping her manage her seizures. We also note that both

seizures and epilepsy are included within the MMMA's definition of "debilitating medical condition." See MCL 333.26423(b)(2). Additionally, the referee gave undue weight to mother's substance abuse history and mischaracterized the record with respect mother's marijuana use at the beginning of this case. The referee essentially substituted his own judgment for that of the medical professionals and thus erred; the record simply does not support the referee's factual finding or legal conclusion.[9]

The trial court's decision to terminate the parental rights of mother and father, which occurred approximately four months later, was similarly focused on mother's medical marijuana use. The trial court terminated mother's and father's parental rights under MCL 712A.19b(3)(c)(*i*) and (g), which provide as follows:

(3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

With respect to mother, the referee found that termination was supported by MCL 712A.19b(3)(c)(*i*) because the condition that led to mother's adjudication was her substance abuse addiction and mother had continued to use substances by using marijuana, which the referee did not believe was actually necessary for a medical purpose.[10] The referee's reasoning

---

[9] We review questions of law de novo. *In re Utrera*, 281 Mich App 1, 15; 761 NW2d 253 (2008). The trial court's factual findings are generally reviewed for clear error. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005); *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 56; 874 NW2d 205 (2015).

[10] The referee also noted one instance where mother had recently tested positive for cocaine. However, mother disputed the accuracy of this drug test, testified that she had observed her drug testing samples not being properly sealed, and adamantly denied using cocaine. She admitted

was focused on the fact that mother was continuing to use marijuana, but the referee did not explain how that continued use had actually had any negative effect on her current parenting ability. The referee found that mother was given a chance at the initial disposition to achieve sobriety and be reunited with SRR, that mother never mentioned at that time that she had a seizure disorder or that she needed to use marijuana to control her seizures, that mother never mentioned having chronic ankle pain that required use of marijuana, and that the letter from mother's neurologist indicated that mother's seizures were controlled without needing to use medical marijuana. The referee speculated that mother's marijuana use would lead to a harmful environment for SRR.

Regarding MCL 712A.19b(3)(g), the referee incorporated the above reasoning and found that this ground had also been established to support terminating mother's parental rights. The referee also found that mother "appeared to have the ability to work" but failed to maintain employment and instead was seeking Social Security benefits.

With respect to father, the referee maintained his focus on mother's medical marijuana use and also relied on MCL 712A.19b(3)(c)(*i*) and (g) to support terminating father's parental rights. Father had been released on parole less than six months before the termination hearing, and he had successfully obtained employment within two weeks of his release. The referee found that father knew about mother's issues with substance addiction and that he nonetheless decided to move in with mother, chose to work 16-18 hours a day for six days a week, and relied on mother to raise SRR without protecting SRR from mother's "severe addiction."

## II. ANALYSIS

In matters regarding the termination of parental rights, we must simultaneously recognize the inherent authority of the trial court to control the proceedings, and to some extent the behavior of the parties, to ensure that the parties are mindful of and demonstrate their ability to ensure the health, safety, and best interests of their minor children while also bearing in mind that the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). Furthermore, we must acknowledge that "[a] parent's right to control the custody and care of her children is not absolute, as the state has a legitimate interest in protecting 'the moral, emotional, mental, and physical welfare of the minor' and in some circumstances 'neglectful parents may be separated from their children.' " *In re Sanders*, 495 Mich 394, 409-410; 852 NW2d 524 (2014), quoting *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972). With these principles in mind, we examine the record to determine whether there was clear and convincing evidence presented in this matter sufficient to legally justify the termination of respondents' parental rights.

---

that she was using marijuana, but she maintained that she was using it for the medical purpose of controlling her seizures and pursuant to a valid medical marijuana card.

Our review of the record leads us to conclude that the referee's factual findings were clearly erroneous and that the above cited statutory grounds were not established by clear and convincing evidence. See *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) ("We review for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses.") (citations and quotation marks omitted).

The condition that led to mother's adjudication was her use of marijuana during her pregnancy that caused SRR to be born testing positive for marijuana. However, by the time of the termination hearing, there was no evidence that mother's use of medical marijuana was having any negative effect on her ability to parent or causing any risk of harm to SRR. In fact, the evidence was overwhelming that there were no significant concerns about mother's parenting time visits and that mother appropriately cared for SRR during visits. There was no evidence that mother was impaired or "high" during her parenting time visits, and mother indicated that she understood the importance of not being in an impaired state while caring for SRR. Further, mother testified that using medical marijuana reduced the frequency of her seizures and that her parenting ability would be negatively affected if she were subject to the likelihood of having seizures more frequently.[11] Mother testified that she was not using any other drugs. Regarding her ability to work, mother testified that she had applied for Supplemental Security Income (SSI) based on her epilepsy and mental disabilities.[12] She also testified that by the time of the termination hearing, she was living with father, who was employed, and that she stayed home and took care of the residence. Mother's name was on the lease.

Following our review of the record in this matter, we conclude that the referee placed far too great an emphasis on the fact that mother consumed medical marijuana. As illustrated herein, the referee felt it important to share his opinions on the consumption of marijuana, regardless of whether consumption was for medical uses, and in instances when his assertions were factually inaccurate—i.e., the use of marijuana to control seizures—he nevertheless clung to his preconceived opinions. Lost in his discussions about the perils of consuming marijuana was the absence of any evidence which demonstrated that respondent mother's use of medical marijuana interfered with her parenting. Hence, the referee's preconceived opinions and over emphasis on respondent mother's use of medical marijuana caused him to lose sight of the fact that it is not the mere undesirable acts (presuming, of course, that the use of a prescribed medicine constituted an undesirable act) of the parents alone that justifies the state in terminating parental rights; there must be some showing of harm or actual risk of harm to the child that

---

[11] Notably, mother testified that she had "quite a few" grand mal seizures while she was in her inpatient drug treatment program at Kairos. This testimony is contrary to the referee's assertion in his findings of fact that "[t]here is no doubt that had she had seizures there, Kairos would have not only noted it to DHHS and in their reports, but they would have transported [mother] to the hospital . . . ."

[12] These included bipolar disorder, depression, and anxiety.

results from the parents' acts. See *In re LaFrance*, 306 Mich App 713, 731; 858 NW2d 143 (2014) ("[D]rug use alone, in the absence of any connection to abuse or neglect, cannot justify termination solely through operation of the doctrine of anticipatory neglect.");[13] cf. also *In re Curry*, 113 Mich App 821, 830; 318 NW2d 567 (1982) ("In sum, we are persuaded that the criminal status alone of these respondents is not a sufficient basis for the probate court's assumption of jurisdiction. Some showing of unfitness of the custodial environment was necessary and no such showing was made in the instant case. The state should not inject itself into the lives of its citizens except when specifically authorized by law and when necessary to prevent abuse and neglect."). "Child protective proceedings are not criminal proceedings," and unlike criminal proceedings, the "purpose of child protective proceedings is *the protection of the child*" rather than to determine a defendant's guilt or innocence. *In re Brock*, 442 Mich 101, 107-108; 499 NW2d 752 (1993) (emphasis added). "The juvenile code is intended to protect children from unfit homes rather than to punish their parents." *Id.* at 108.

The record does not support the conclusion that there was clear and convincing evidence that mother continued to have an issue with substance abuse that presented an actual risk of harm to SRR. The concerns expressed in the proceedings below were based more on the referee's speculation that mother's use of medical marijuana *might* lead to creating a harmful environment for SRR even though the overwhelming evidence related to mother's current medical marijuana

---

[13] In *LaFrance*, this Court dealt with a situation similar to the one presented here, where little deference was shown for the medical judgment of a respondent's treating physicians. The *LaFrance* Court explained as follows:

> Indeed, an early signal that consumption of prescription medication would be overvalued in this case was when, at the initial dispositional hearing, the caseworker expressed her understanding that both respondents had prescriptions for hydrocodone, and that tests revealed concentrations of that drug well within therapeutic levels, but nonetheless insisted that respondents terminate what the witness understood to be respondents' respective physician-directed courses of treatment in deference to her own general concerns about the hazards of that pharmaceutical. [*In re LaFrance*, 306 Mich App at 731 n 7.]

In concluding that the respondents' failure to control their substance abuse problems, standing alone, was not sufficient to support terminating the respondents' parental rights to three children under MCL 712A.19b(3)(c)(*i*), (g), and (j), the *LaFrance* Court reasoned:

> Cases that come before this Court often dramatically illustrate that substance abuse can cause, or exacerbate, serious parenting deficiencies, but the instant case is a poor example. We do not mean to imply any approval of the protracted, and sometimes illegal, use of prescription medications so much in evidence in this case, even as we refrain from repeating the trial court's apparent mistake of simply assuming that overuse, or illegal acquisition, of such medications is itself ground for concluding child neglect or abuse will ever result from it. [*In re LaFrance*, 306 Mich App at 731.]

-13-

use and parenting skills indicated just the opposite. See *In re LaFrance*, 306 Mich App at 732 ("Termination of parental rights requires 'both a failure and an inability to provide proper care and custody,' which in turn requires more than 'speculative opinions . . . regarding what *might* happen in the future.' ") (citation omitted). While we are not downplaying mother's history of substance abuse, not every ingestion of a substance constitutes abuse, especially when viewed in the larger context of whether there is an effect of the substance use on the child or the parent's parenting ability. There must be facts within the record demonstrating that the parent's acts are actually harming or presenting an articulable risk of harm to the child, and the trial court cannot simply presume a risk of harm from its own prior experiences or personal disapproval of a parent's choices. See MCL 333.26424(d) ("A person shall not be denied custody or visitation of a minor for acting in accordance with this act, *unless the person's behavior is such that it creates an unreasonable danger to the minor that can be clearly articulated and substantiated.*") (emphasis added); *In re LaFrance*, 306 Mich App at 731-732; cf. also *In re Curry*, 113 Mich App at 830. Rather, in this case, the record reveals that the referee essentially placed the burden on mother to demonstrate her fitness as a parent and her ability to provide proper care and custody, which is an unconstitutional means of deciding whether to terminate parental rights. See *In re LaFlure*, 48 Mich App 377, 384-386; 210 NW2d 482 (1973); see also *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000), abrogated by statute on other grounds as stated in *In re Moss*, 301 Mich App at 83, 88 ("[I]t is well established that the petitioner for the termination of parental rights bears the burden of proving at least one ground for termination."). Without such evidence, there was not clear and convincing evidence to show that mother had not rectified the condition that led to her adjudication or that mother could not provide proper care and custody, and the trial court therefore committed clear error by terminating mother's parental rights.

With respect to father, whose parental rights were also terminated essentially due to mother's medical marijuana use as well, the record similarly does not support the referee's determination that statutory grounds had been proven by clear and convincing evidence.

As previously discussed, there was no evidence to suggest that mother presented a current risk of harm to the child despite her use of medical marijuana. Although the referee appeared to fault father for the nature of his work schedule and how it interfered with his ability to participate in various services, it seems commendable to us that father found significant employment rather than remaining unemployed or underemployed.[14] Father testified that he was concerned about keeping his job, which "looked very good for [his] parole officer" and would allow him to remain out of prison. Father also testified that he would be laid off for a period of time in the winter, during which time he could participate in more services. Moreover, there was evidence that father had shown improvement in his parenting skills during his parenting time visits over the past months since his release. The referee also supported his decision by

---

[14] The referee's reasoning on this point illustrates the catch-22 parents are often put in during child-protective proceedings. They are considered neglectful either because they have inadequate employment or because they have employment that does not offer ideal flexibility or control regarding scheduling, without consideration for the nature of the employment for which the parent might actually be qualified.

referencing drug tests for father that were positive for marijuana and cocaine. But father denied using these drugs, testified about the loose adherence to procedures at the drug testing facility, and he testified that he had had to complete drug screens as part of his parole and did not have any parole violations. As with mother, we conclude that there was not clear and convincing evidence that that father was harming or presenting an articulable risk of harm to SRR, either based on his own actions or based on his plan of relying on mother to care for the child in their joint home while he worked. Thus, the trial court clearly erred by terminating his parental rights under MCL 712A.19b(3)(c)(*i*) and (g) as well.

Accordingly, we vacate the trial court's order terminating the parental rights of mother and father, and we remand for further proceedings not inconsistent with this opinion.

Vacated and remanded. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Douglas B. Shapiro